Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## RODRIGUEZ *v.* UNITED STATES

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 13–9972.　Argued January 21, 2015—Decided April 21, 2015

Officer Struble, a K–9 officer, stopped petitioner Rodriguez for driving on a highway shoulder, a violation of Nebraska law. After Struble attended to everything relating to the stop, including, *inter alia,* checking the driver's licenses of Rodriguez and his passenger and issuing a warning for the traffic offense, he asked Rodriguez for permission to walk his dog around the vehicle. When Rodriguez refused, Struble detained him until a second officer arrived. Struble then retrieved his dog, who alerted to the presence of drugs in the vehicle. The ensuing search revealed methamphetamine. Seven or eight minutes elapsed from the time Struble issued the written warning until the dog alerted.

　Rodriguez was indicted on federal drug charges. He moved to suppress the evidence seized from the vehicle on the ground, among others, that Struble had prolonged the traffic stop without reasonable suspicion in order to conduct the dog sniff. The Magistrate Judge recommended denial of the motion. He found no reasonable suspicion supporting detention once Struble issued the written warning. Under Eighth Circuit precedent, however, he concluded that prolonging the stop by "seven to eight minutes" for the dog sniff was only a *de minimis* intrusion on Rodriguez's Fourth Amendment rights and was for that reason permissible. The District Court then denied the motion to suppress. Rodriguez entered a conditional guilty plea and was sentenced to five years in prison. The Eighth Circuit affirmed. Noting that the seven or eight minute delay was an acceptable "*de minimis* intrusion on Rodriguez's personal liberty," the court declined to reach the question whether Struble had reasonable suspicion to continue Rodriguez's detention after issuing the written warning.

Held:

Syllabus

1. Absent reasonable suspicion, police extension of a traffic stop in order to conduct a dog sniff violates the Constitution's shield against unreasonable seizures.

A routine traffic stop is more like a brief stop under *Terry* v. *Ohio*, 392 U. S. 1, than an arrest, see, *e.g., Arizona* v. *Johnson*, 555 U. S. 323, 330. Its tolerable duration is determined by the seizure's "mission," which is to address the traffic violation that warranted the stop, *Illinois* v. *Caballes*, 543 U. S. 405, 407 and attend to related safety concerns. Authority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been— completed. The Fourth Amendment may tolerate certain unrelated investigations that do not lengthen the roadside detention, *Johnson*, 555 U. S., at 327–328 (questioning); *Caballes*, 543 U. S., at 406, 408 (dog sniff), but a traffic stop "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket, *id.,* at 407.

Beyond determining whether to issue a traffic ticket, an officer's mission during a traffic stop typically includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. See *Delaware* v. *Prouse*, 440 U. S. 648, 658–659. Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission.

In concluding that the *de minimis* intrusion here could be offset by the Government's interest in stopping the flow of illegal drugs, the Eighth Circuit relied on *Pennsylvania* v. *Mimms*, 434 U. S. 106. The Court reasoned in *Mimms* that the government's "legitimate and weighty" interest in officer safety outweighed the "*de minimis*" additional intrusion of requiring a driver, lawfully stopped, to exit a vehicle, *id.,* at 110–111. The officer-safety interest recognized in *Mimms*, however, stemmed from the danger to the officer associated with the traffic stop itself. On-scene investigation into other crimes, in contrast, detours from the officer's traffic-control mission and therefore gains no support from *Mimms*.

The Government's argument that an officer who completes all traffic-related tasks expeditiously should earn extra time to pursue an unrelated criminal investigation is unpersuasive, for a traffic stop "prolonged beyond" the time in fact needed for the officer to complete his traffic-based inquiries is "unlawful," *Caballes*, 543 U. S., at 407. The critical question is not whether the dog sniff occurs before or after the officer issues a ticket, but whether conducting the sniff adds

Syllabus

time to the stop. Pp. 5–8.

　　2. The determination adopted by the District Court that detention for the dog sniff was not independently supported by individualized suspicion was not reviewed by the Eighth Circuit. That question therefore remains open for consideration on remand. P. 9.

741 F. 3d 905, vacated and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. KENNEDY, J., filed a dissenting opinion. THOMAS, J., filed a dissenting opinion, in which ALITO, J., joined, and in which KENNEDY, J., joined as to all but Part III. ALITO, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–9972
_____

## DENNYS RODRIGUEZ, PETITIONER *v.* UNITED STATES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[April 21, 2015]

JUSTICE GINSBURG delivered the opinion of the Court.

In *Illinois* v. *Caballes*, 543 U. S. 405 (2005), this Court held that a dog sniff conducted during a lawful traffic stop does not violate the Fourth Amendment's proscription of unreasonable seizures. This case presents the question whether the Fourth Amendment tolerates a dog sniff conducted after completion of a traffic stop. We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for the violation. *Id.*, at 407. The Court so recognized in *Caballes*, and we adhere to the line drawn in that decision.

## I

Just after midnight on March 27, 2012, police officer Morgan Struble observed a Mercury Mountaineer veer slowly onto the shoulder of Nebraska State Highway 275 for one or two seconds and then jerk back onto the road.

Nebraska law prohibits driving on highway shoulders, see Neb. Rev. Stat. §60–6,142 (2010), and on that basis, Struble pulled the Mountaineer over at 12:06 a.m. Struble is a K–9 officer with the Valley Police Department in Nebraska, and his dog Floyd was in his patrol car that night. Two men were in the Mountaineer: the driver, Dennys Rodriguez, and a front-seat passenger, Scott Pollman.

Struble approached the Mountaineer on the passenger's side. After Rodriguez identified himself, Struble asked him why he had driven onto the shoulder. Rodriguez replied that he had swerved to avoid a pothole. Struble then gathered Rodriguez's license, registration, and proof of insurance, and asked Rodriguez to accompany him to the patrol car. Rodriguez asked if he was required to do so, and Struble answered that he was not. Rodriguez decided to wait in his own vehicle.

After running a records check on Rodriguez, Struble returned to the Mountaineer. Struble asked passenger Pollman for his driver's license and began to question him about where the two men were coming from and where they were going. Pollman replied that they had traveled to Omaha, Nebraska, to look at a Ford Mustang that was for sale and that they were returning to Norfolk, Nebraska. Struble returned again to his patrol car, where he completed a records check on Pollman, and called for a second officer. Struble then began writing a warning ticket for Rodriguez for driving on the shoulder of the road.

Struble returned to Rodriguez's vehicle a third time to issue the written warning. By 12:27 or 12:28 a.m., Struble had finished explaining the warning to Rodriguez, and had given back to Rodriguez and Pollman the documents obtained from them. As Struble later testified, at that point, Rodriguez and Pollman "had all their documents back and a copy of the written warning. I got all the reason[s] for the stop out of the way[,] . . . took care of all

the business." App. 70.

Nevertheless, Struble did not consider Rodriguez "free to leave." *Id.,* at 69–70. Although justification for the traffic stop was "out of the way," *id.,* at 70, Struble asked for permission to walk his dog around Rodriguez's vehicle. Rodriguez said no. Struble then instructed Rodriguez to turn off the ignition, exit the vehicle, and stand in front of the patrol car to wait for the second officer. Rodriguez complied. At 12:33 a.m., a deputy sheriff arrived. Struble retrieved his dog and led him twice around the Mountaineer. The dog alerted to the presence of drugs halfway through Struble's second pass. All told, seven or eight minutes had elapsed from the time Struble issued the written warning until the dog indicated the presence of drugs. A search of the vehicle revealed a large bag of methamphetamine.

Rodriguez was indicted in the United States District Court for the District of Nebraska on one count of possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U. S. C. §§841(a)(1) and (b)(1). He moved to suppress the evidence seized from his car on the ground, among others, that Struble had prolonged the traffic stop without reasonable suspicion in order to conduct the dog sniff.

After receiving evidence, a Magistrate Judge recommended that the motion be denied. The Magistrate Judge found no probable cause to search the vehicle independent of the dog alert. App. 100 (apart from "information given by the dog," "Officer Struble had [no]thing other than a rather large hunch"). He further found that no reasonable suspicion supported the detention once Struble issued the written warning. He concluded, however, that under Eighth Circuit precedent, extension of the stop by "seven to eight minutes" for the dog sniff was only a *de minimis* intrusion on Rodriguez's Fourth Amendment rights and was therefore permissible.

The District Court adopted the Magistrate Judge's factual findings and legal conclusions and denied Rodriguez's motion to suppress. The court noted that, in the Eighth Circuit, "dog sniffs that occur within a short time following the completion of a traffic stop are not constitutionally prohibited if they constitute only de minimis intrusions." App. 114 (quoting *United States* v. *Alexander*, 448 F. 3d 1014, 1016 (CA8 2006)). The court thus agreed with the Magistrate Judge that the "7 to 10 minutes" added to the stop by the dog sniff "was not of constitutional significance." App. 114. Impelled by that decision, Rodriguez entered a conditional guilty plea and was sentenced to five years in prison.

The Eighth Circuit affirmed. The "seven- or eight-minute delay" in this case, the opinion noted, resembled delays that the court had previously ranked as permissible. 741 F. 3d 905, 907 (2014). The Court of Appeals thus ruled that the delay here constituted an acceptable "*de minimis* intrusion on Rodriguez's personal liberty." *Id.,* at 908. Given that ruling, the court declined to reach the question whether Struble had reasonable suspicion to continue Rodriguez's detention after issuing the written warning.

We granted certiorari to resolve a division among lower courts on the question whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff. 573 U. S. ___ (2014). Compare, *e.g., United States* v. *Morgan*, 270 F. 3d 625, 632 (CA8 2001) (postcompletion delay of "well under ten minutes" permissible), with, *e.g., State* v. *Baker*, 2010 UT 18, ¶13, 229 P. 3d 650, 658 (2010) ("[W]ithout additional reasonable suspicion, the officer must allow the seized person to depart once the purpose of the stop has concluded.").

## II

A seizure for a traffic violation justifies a police investigation of that violation.  "[A] relatively brief encounter," a routine traffic stop is "more analogous to a so-called 'Terry stop' . . . than to a formal arrest."  *Knowles* v. *Iowa*, 525 U. S. 113, 117 (1998) (quoting *Berkemer* v. *McCarty*, 468 U. S. 420, 439 (1984), in turn citing *Terry* v. *Ohio*, 392 U. S. 1 (1968)).  See also *Arizona* v. *Johnson*, 555 U. S. 323, 330 (2009).  Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, *Caballes*, 543 U. S., at 407, and attend to related safety concerns, *infra*, at 6–7.  See also *United States* v. *Sharpe*, 470 U. S. 675, 685 (1985); *Florida* v. *Royer*, 460 U. S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification.").  Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose."  *Ibid.*  See also *Caballes*, 543 U. S., at 407.  Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.  See *Sharpe*, 470 U. S., at 686 (in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation").

Our decisions in *Caballes* and *Johnson* heed these constraints.  In both cases, we concluded that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention.  *Johnson*, 555 U. S., at 327–328 (questioning); *Caballes*, 543 U. S., at 406, 408 (dog sniff).  In *Caballes*, however, we cautioned that a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket.  543 U. S., at 407.  And we repeated that admonition in *Johnson*: The seizure remains lawful only "so long as [unrelated] inquiries do

not measurably extend the duration of the stop." 555 U. S., at 333. See also *Muehler* v. *Mena*, 544 U. S. 93, 101 (2005) (because unrelated inquiries did not "exten[d] the time [petitioner] was detained[,] . . . no additional Fourth Amendment justification . . . was required"). An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But contrary to JUSTICE ALITO's suggestion, *post,* at 4, n. 2, he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual. But see *post*, at 1–2 (ALITO, J., dissenting) (premising opinion on the dissent's own finding of "reasonable suspicion," although the District Court reached the opposite conclusion, and the Court of Appeals declined to consider the issue).

Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." *Caballes*, 543 U. S., at 408. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. See *Delaware* v. *Prouse*, 440 U. S. 648, 658–660 (1979). See also 4 W. LaFave, Search and Seizure §9.3(c), pp. 507–517 (5th ed. 2012). These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. See *Prouse,* 440 U. S., at 658–659; LaFave, Search and Seizure §9.3(c), at 516 (A "warrant check makes it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.").

A dog sniff, by contrast, is a measure aimed at "detect[ing] evidence of ordinary criminal wrongdoing." *Indianapolis* v. *Edmond*, 531 U. S. 32, 40–41 (2000). See also *Florida* v. *Jardines*, 569 U. S. 1, ___–___ (2013) (slip op., at 7–8). Candidly, the Government acknowledged at

oral argument that a dog sniff, unlike the routine measures just mentioned, is not an ordinary incident of a traffic stop. See Tr. of Oral Arg. 33. Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission.

In advancing its *de minimis* rule, the Eighth Circuit relied heavily on our decision in *Pennsylvania* v. *Mimms*, 434 U. S. 106 (1977) (*per curiam*). See *United States* v. *$404,905.00 in U. S. Currency*, 182 F. 3d 643, 649 (CA8 1999). In *Mimms*, we reasoned that the government's "legitimate and weighty" interest in officer safety outweighs the "*de minimis*" additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle. 434 U. S., at 110–111. See also *Maryland* v. *Wilson*, 519 U. S. 408, 413–415 (1997) (passengers may be required to exit vehicle stopped for traffic violation). The Eighth Circuit, echoed in JUSTICE THOMAS's dissent, believed that the imposition here similarly could be offset by the Government's "strong interest in interdicting the flow of illegal drugs along the nation's highways." *$404,905.00 in U. S. Currency*, 182 F. 3d, at 649; see *post*, at 9.

Unlike a general interest in criminal enforcement, however, the government's officer safety interest stems from the mission of the stop itself. Traffic stops are "especially fraught with danger to police officers," *Johnson*, 555 U. S., at 330 (internal quotation marks omitted), so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely. Cf. *United States* v. *Holt*, 264 F. 3d 1215, 1221–1222 (CA10 2001) (en banc) (recognizing officer safety justification for criminal record and outstanding warrant checks), abrogated on other grounds as recognized in *United States* v. *Stewart*, 473 F. 3d 1265, 1269 (CA10 2007). On-scene investigation into other crimes, however, detours from that mission. See *supra*, at 6–7. So too do safety precau-

tions taken in order to facilitate such detours. But cf. *post,* at 2–3 (ALITO, J., dissenting). Thus, even assuming that the imposition here was no more intrusive than the exit order in *Mimms,* the dog sniff could not be justified on the same basis. Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular.

The Government argues that an officer may "incremental[ly]" prolong a stop to conduct a dog sniff so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances. Brief for United States 36–39. The Government's argument, in effect, is that by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue an unrelated criminal investigation. See also *post,* at 2–5 (THOMAS, J., dissenting) (embracing the Government's argument). The reasonableness of a seizure, however, depends on what the police in fact do. See *Knowles,* 525 U. S., at 115–117. In this regard, the Government acknowledges that "an officer always has to be reasonably diligent." Tr. of Oral Arg. 49. How could diligence be gauged other than by noting what the officer actually did and how he did it? If an officer can complete traffic-based inquiries expeditiously, then that is the amount of "time reasonably required to complete [the stop's] mission." *Caballes,* 543 U. S., at 407. As we said in *Caballes* and reiterate today, a traffic stop "prolonged beyond" that point is "unlawful." *Ibid.* The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, as JUSTICE ALITO supposes, *post,* at 2–4, but whether conducting the sniff "prolongs"—*i.e.,* adds time to—"the stop," *supra,* at 6.

### III

The Magistrate Judge found that detention for the dog sniff in this case was not independently supported by individualized suspicion, see App. 100, and the District Court adopted the Magistrate Judge's findings, see *id.*, at 112–113. The Court of Appeals, however, did not review that determination. But see *post,* at 1, 10–12 (THOMAS, J., dissenting) (resolving the issue, nevermind that the Court of Appeals left it unaddressed); *post,* at 1–2 (ALITO, J., dissenting) (upbraiding the Court for addressing the sole issue decided by the Court of Appeals and characterizing the Court's answer as "unnecessary" because the Court, instead, should have decided an issue the Court of Appeals did not decide). The question whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation, therefore, remains open for Eighth Circuit consideration on remand.

\*      \*      \*

For the reasons stated, the judgment of the United States Court of Appeals for the Eighth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–9972

_____

## DENNYS RODRIGUEZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[April 21, 2015]

JUSTICE KENNEDY, dissenting.

My join in JUSTICE THOMAS' dissenting opinion does not extend to Part III. Although the issue discussed in that Part was argued here, the Court of Appeals has not addressed that aspect of the case in any detail. In my view the better course would be to allow that court to do so in the first instance.

Appellate Case: 13-1176    Page: 13    Date Filed: 04/21/2015 Entry ID: 4272596

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–9972

_____

## DENNYS RODRIGUEZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[April 21, 2015]

JUSTICE THOMAS, with whom JUSTICE ALITO joins, and
with whom JUSTICE KENNEDY joins as to all but Part III,
dissenting.

Ten years ago, we explained that "conducting a dog sniff
[does] not change the character of a traffic stop that is
lawful at its inception and otherwise executed in a reason-
able manner." *Illinois* v. *Caballes*, 543 U. S. 405, 408
(2005). The only question here is whether an officer exe-
cuted a stop in a reasonable manner when he waited to
conduct a dog sniff until after he had given the driver a
written warning and a backup unit had arrived, bringing
the overall duration of the stop to 29 minutes. Because
the stop was reasonably executed, no Fourth Amendment
violation occurred. The Court's holding to the contrary
cannot be reconciled with our decision in *Caballes* or a
number of common police practices. It was also unneces-
sary, as the officer possessed reasonable suspicion to
continue to hold the driver to conduct the dog sniff. I
respectfully dissent.

## I

The Fourth Amendment protects "[t]he right of the
people to be secure in their persons, houses, papers, and
effects, against unreasonable searches and seizures."
U. S. Const., Amdt. 4. As the text indicates, and as we

have repeatedly confirmed, "the ultimate touchstone of the
Fourth Amendment is 'reasonableness.'" *Brigham City* v.
*Stuart*, 547 U. S. 398, 403 (2006). We have defined rea-
sonableness "in objective terms by examining the totality
of the circumstances," *Ohio* v. *Robinette*, 519 U. S. 33, 39
(1996), and by considering "the traditional protections
against unreasonable searches and seizures afforded by
the common law at the time of the framing," *Atwater* v.
*Lago Vista*, 532 U. S. 318, 326 (2001) (internal quotation
marks omitted). When traditional protections have not
provided a definitive answer, our precedents have "ana-
lyzed a search or seizure in light of traditional standards
of reasonableness by assessing, on the one hand, the de-
gree to which it intrudes upon an individual's privacy and,
on the other, the degree to which it is needed for the pro-
motion of legitimate governmental interests." *Virginia* v.
*Moore*, 553 U. S. 164, 171 (2008) (internal quotation
marks omitted).

Although a traffic stop "constitutes a 'seizure' of 'per-
sons' within the meaning of [the Fourth Amendment],"
such a seizure is constitutionally "reasonable where the
police have probable cause to believe that a traffic viola-
tion has occurred." *Whren* v. *United States*, 517 U. S. 806,
809–810 (1996). But "a seizure that is lawful at its incep-
tion can violate the Fourth Amendment if its manner of
execution unreasonably infringes interests protected by
the Constitution." *Caballes*, *supra,* at 407.

Because Rodriguez does not dispute that Officer Struble
had probable cause to stop him, the only question is
whether the stop was otherwise executed in a reasonable
manner. See Brief for Appellant in No. 13–1176 (CA8),
p. 4, n. 2. I easily conclude that it was. Approximately 29
minutes passed from the time Officer Struble stopped
Rodriguez until his narcotics-detection dog alerted to the
presence of drugs. That amount of time is hardly out of
the ordinary for a traffic stop by a single officer of a vehi-

cle containing multiple occupants even when no dog sniff is involved. See, *e.g., United States* v. *Ellis*, 497 F. 3d 606 (CA6 2007) (22 minutes); *United States* v. *Barragan*, 379 F. 3d 524 (CA8 2004) (approximately 30 minutes). During that time, Officer Struble conducted the ordinary activities of a traffic stop—he approached the vehicle, questioned Rodriguez about the observed violation, asked Pollman about their travel plans, ran serial warrant checks on Rodriguez and Pollman, and issued a written warning to Rodriguez. And when he decided to conduct a dog sniff, he took the precaution of calling for backup out of concern for his safety. See 741 F. 3d 905, 907 (CA8 2014); see also *Pennsylvania* v. *Mimms*, 434 U. S. 106, 110 (1977) (*per curiam*) (officer safety is a "legitimate and weighty" concern relevant to reasonableness).

As *Caballes* makes clear, the fact that Officer Struble waited until after he gave Rodriguez the warning to conduct the dog sniff does not alter this analysis. Because "the use of a well-trained narcotics-detection dog . . . generally does not implicate legitimate privacy interests," 543 U. S., at 409, "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner," *id.,* at 408. The stop here was "lawful at its inception and otherwise executed in a reasonable manner." *Ibid.* As in *Caballes*, "conducting a dog sniff [did] not change the character of [the] traffic stop," *ibid.,* and thus no Fourth Amendment violation occurred.

## II

Rather than adhere to the reasonableness requirement that we have repeatedly characterized as the "touchstone of the Fourth Amendment," *Brigham City, supra,* at 403, the majority constructed a test of its own that is inconsistent with our precedents.

### A

The majority's rule requires a traffic stop to "en[d] when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Ante*, at 5. "If an officer can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete the stop's mission" and he may hold the individual no longer. *Ante*, at 8 (internal quotation marks and alterations omitted). The majority's rule thus imposes a one-way ratchet for constitutional protection linked to the characteristics of the individual officer conducting the stop: If a driver is stopped by a particularly efficient officer, then he will be entitled to be released from the traffic stop after a shorter period of time than a driver stopped by a less efficient officer. Similarly, if a driver is stopped by an officer with access to technology that can shorten a records check, then he will be entitled to be released from the stop after a shorter period of time than an individual stopped by an officer without access to such technology.

I "cannot accept that the search and seizure protections of the Fourth Amendment are so variable and can be made to turn upon such trivialities." *Whren*, 517 U. S*.,* at 815 (citations omitted). We have repeatedly explained that the reasonableness inquiry must not hinge on the characteristics of the individual officer conducting the seizure. We have held, for example, that an officer's state of mind "does not invalidate [an] action taken as long as the circumstances, viewed objectively, justify that action." *Id.*, at 813 (internal quotation marks omitted). We have spurned theories that would make the Fourth Amendment "change with local law enforcement practices." *Moore*, *supra*, at 172. And we have rejected a rule that would require the offense establishing probable cause to be "closely related to" the offense identified by the arresting officer, as such a rule would make "the constitutionality of an arrest . . . vary from place to place and from time to time, depending

on whether the arresting officer states the reason for the detention and, if so, whether he correctly identifies a general class of offense for which probable cause exists." *Devenpeck* v. *Alford*, 543 U. S. 146, 154 (2004) (internal quotation marks and citation omitted). In *Devenpeck*, a unanimous Court explained: "An arrest made by a knowledgeable, veteran officer would be valid, whereas an arrest made by a rookie *in precisely the same circumstances* would not. We see no reason to ascribe to the Fourth Amendment such arbitrarily variable protection." *Ibid.*

The majority's logic would produce similarly arbitrary results. Under its reasoning, a traffic stop made by a rookie could be executed in a reasonable manner, whereas the same traffic stop made by a knowledgeable, veteran officer *in precisely the same circumstances* might not, if in fact his knowledge and experience made him capable of completing the stop faster. We have long rejected interpretations of the Fourth Amendment that would produce such haphazard results, and I see no reason to depart from our consistent practice today.

## B

As if that were not enough, the majority also limits the duration of the stop to the time it takes the officer to complete a narrow category of "traffic-based inquiries." *Ante,* at 8. According to the majority, these inquiries include those that "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Ante,* at 6. Inquiries directed to "detecting evidence of ordinary criminal wrongdoing" are not traffic-related inquiries and thus cannot count toward the overall duration of the stop. *Ibid.* (internal quotation marks and alteration omitted).

The combination of that definition of traffic-related inquiries with the majority's officer-specific durational limit produces a result demonstrably at odds with our

decision in *Caballes*. *Caballes* expressly anticipated that a
traffic stop could be *reasonably* prolonged for officers to
engage in a dog sniff. We explained that no Fourth
Amendment violation had occurred in *Caballes*, where the
"duration of the stop . . . was entirely justified by the
traffic offense and the ordinary inquiries incident to such
a stop," but suggested a different result might attend a
case "involving a dog sniff that occurred during an *unrea-
sonably* prolonged traffic stop." 543 U. S., at 407–408
(emphasis added). The dividing line was whether the
overall duration of the stop exceeded "the time reasonably
required to complete th[e] mission," *id.,* at 407, not, as the
majority suggests, whether the duration of the stop "in
fact" exceeded the time necessary to complete the traffic-
related inquiries, *ante,* at 8.

The majority's approach draws an artificial line between
dog sniffs and other common police practices. The lower
courts have routinely confirmed that warrant checks are a
constitutionally permissible part of a traffic stop, see, *e.g.,
United States* v. *Simmons*, 172 F. 3d 775, 778 (CA11
1999); *United States* v. *Mendez*, 118 F. 3d 1426, 1429
(CA10 1997); *United States* v. *Shabazz*, 993 F. 2d 431, 437
(CA5 1993), and the majority confirms that it finds no
fault in these measures, *ante,* at 6. Yet its reasoning
suggests the opposite. Such warrant checks look more like
they are directed to "detecting evidence of ordinary crimi-
nal wrongdoing" than to "ensuring that vehicles on the
road are operated safely and responsibly." *Ante,* at 6
(internal quotation marks and alteration omitted). Per-
haps one could argue that the existence of an outstanding
warrant might make a driver less likely to operate his
vehicle safely and responsibly on the road, but the same
could be said about a driver in possession of contraband.
A driver confronted by the police in either case might try
to flee or become violent toward the officer. But under the
majority's analysis, a dog sniff, which is directed at uncov-

ering that problem, is not treated as a traffic-based inquiry. Warrant checks, arguably, should fare no better. The majority suggests that a warrant check is an ordinary inquiry incident to a traffic stop because it can be used "'to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.'" *Ante,* at 6 (quoting 4 W. LaFave, Search and Seizure §9.3(c), p. 516 (5th ed. 2012)). But as the very treatise on which the majority relies notes, such checks are a "manifest[ation of] the 'war on drugs' motivation so often underlying [routine traffic] stops," and thus are very much like the dog sniff in this case. *Id.*, §9.3(c), at 507–508.

Investigative questioning rests on the same basis as the dog sniff. "Asking questions is an essential part of police investigations." *Hiibel* v. *Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U. S. 177, 185 (2004). And the lower courts have routinely upheld such questioning during routine traffic stops. See, *e.g., United States* v. *Rivera*, 570 F. 3d 1009, 1013 (CA8 2009); *United States* v. *Childs*, 277 F. 3d 947, 953–954 (CA7 2002). The majority's reasoning appears to allow officers to engage in *some* questioning aimed at detecting evidence of ordinary criminal wrongdoing. *Ante,* at 5. But it is hard to see how such inquiries fall within the "seizure's 'mission' [of] address[ing] the traffic violation that warranted the stop," or "attend[ing] to related safety concerns." *Ibid.* Its reasoning appears to come down to the principle that dogs are different.

### C

On a more fundamental level, the majority's inquiry elides the distinction between traffic stops based on probable cause and those based on reasonable suspicion. Probable cause is *the* "traditional justification" for the seizure of a person. *Whren*, 517 U. S., at 817 (emphasis deleted); see also *Dunaway* v. *New York*, 442 U. S. 200,

207–208 (1979). This Court created an exception to that rule in *Terry* v. *Ohio*, 392 U. S. 1 (1968), permitting "police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause," *Michigan* v. *Summers*, 452 U. S. 692, 698 (1981). Reasonable suspicion is the justification for such seizures. *Prado Navarette* v. *California*, 572 U. S. ___, ___ (2014) (slip op., at 3).

Traffic stops can be initiated based on probable cause or reasonable suspicion. Although the Court has commented that a routine traffic stop is "more analogous to a so-called '*Terry* stop' than to a formal arrest," it has rejected the notion "that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a *Terry* stop." *Berkemer* v. *McCarty*, 468 U. S. 420, 439, and n. 29 (1984) (citation omitted).

Although all traffic stops must be executed reasonably, our precedents make clear that traffic stops justified by reasonable suspicion are subject to additional limitations that those justified by probable cause are not. A traffic stop based on reasonable suspicion, like all *Terry* stops, must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Hiibel*, 542 U. S., at 185 (internal quotation marks omitted). It also "cannot continue for an excessive period of time or resemble a traditional arrest." *Id.,* at 185–186 (citation omitted). By contrast, a stop based on probable cause affords an officer considerably more leeway. In such seizures, an officer may engage in a warrantless arrest of the driver, *Atwater*, 532 U. S., at 354, a warrantless search incident to arrest of the driver, *Riley* v. *California*, 573 U. S. ___, ___ (2014) (slip op., at 5), and a warrantless search incident to arrest of the vehicle if it is reasonable to believe evidence relevant to the crime of arrest might be found there, *Arizona* v. *Gant*, 556 U. S. 332, 335 (2009).

The majority casually tosses this distinction aside. It asserts that the traffic stop in this case, which was undisputedly initiated on the basis of probable cause, can last no longer than is in fact necessary to effectuate the mission of the stop. *Ante,* at 8. And, it assumes that the mission of the stop was merely to write a traffic ticket, rather than to consider making a custodial arrest. *Ante,* at 5. In support of that durational requirement, it relies primarily on cases involving *Terry* stops. See *ante,* at 5–7 (citing *Arizona* v. *Johnson*, 555 U. S. 323 (2009) (analyzing "stop and frisk" of *passenger* in a vehicle temporarily seized for a traffic violation); *United States* v. *Sharpe*, 470 U. S. 675 (1985) (analyzing seizure of individuals based on suspicion of marijuana trafficking); *Florida* v. *Royer*, 460 U. S. 491 (1983) (plurality opinion) (analyzing seizure of man walking through airport on suspicion of narcotics activity)).

The *only* case involving a traffic stop based on probable cause that the majority cites for its rule is *Caballes*. But, that decision provides no support for today's restructuring of our Fourth Amendment jurisprudence. In *Caballes*, the Court made clear that, in the context of a traffic stop supported by probable cause, "a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner." 543 U. S., at 408. To be sure, *the dissent* in *Caballes* would have "appl[ied] *Terry*'s reasonable-relation test . . . to determine whether the canine sniff impermissibly expanded the scope of the initially valid seizure of Caballes." *Id.,* at 420 (GINSBURG, J., dissenting). But even it conceded that the *Caballes* majority had "implicitly [rejected] the application of *Terry* to a traffic stop converted, by calling in a dog, to a drug search." *Id.,* at 421.

By strictly limiting the tasks that define the durational scope of the traffic stop, the majority accomplishes today what the *Caballes* dissent could not: strictly limiting the

scope of an officer's activities during a traffic stop justified by probable cause. In doing so, it renders the difference between probable cause and reasonable suspicion virtually meaningless in this context. That shift is supported neither by the Fourth Amendment nor by our precedents interpreting it. And, it results in a constitutional framework that lacks predictability. Had Officer Struble arrested, handcuffed, and taken Rodriguez to the police station for his traffic violation, he would have complied with the Fourth Amendment. See *Atwater, supra,* at 354–355. But because he made Rodriguez wait for seven or eight extra minutes until a dog arrived, he evidently committed a constitutional violation. Such a view of the Fourth Amendment makes little sense.

## III

Today's revision of our Fourth Amendment jurisprudence was also entirely unnecessary. Rodriguez suffered no Fourth Amendment violation here for an entirely independent reason: Officer Struble had reasonable suspicion to continue to hold him for investigative purposes. Our precedents make clear that the Fourth Amendment permits an officer to conduct an investigative traffic stop when that officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Prado Navarette,* 572 U. S*.,* at ___ (slip op., at 3) (internal quotation marks omitted). Reasonable suspicion is determined by looking at "the whole picture," *ibid.*, taking into account "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," *Ornelas* v. *United States*, 517 U. S. 690, 695 (1996) (internal quotation marks omitted).

Officer Struble testified that he first became suspicious that Rodriguez was engaged in criminal activity for a number of reasons. When he approached the vehicle, he

smelled an "overwhelming odor of air freshener coming from the vehicle," which is, in his experience, "a common attempt to conceal an odor that [people] don't want . . . to be smelled by the police." App. 20–21. He also observed, upon approaching the front window on the passenger side of the vehicle, that Rodriguez's passenger, Scott Pollman, appeared nervous. Pollman pulled his hat down low, puffed nervously on a cigarette, and refused to make eye contact with him. The officer thought he was "more nervous than your typical passenger" who "do[esn't] have anything to worry about because [t]hey didn't commit a [traffic] violation." *Id.*, at 34.

Officer Struble's interactions with the vehicle's occupants only increased his suspicions. When he asked Rodriguez why he had driven onto the shoulder, Rodriguez claimed that he swerved to avoid a pothole. But that story could not be squared with Officer Struble's observation of the vehicle slowly driving off the road before being jerked back onto it. And when Officer Struble asked Pollman where they were coming from and where they were going, Pollman told him they were traveling from Omaha, Nebraska, back to Norfolk, Nebraska, after looking at a vehicle they were considering purchasing. Pollman told the officer that he had neither seen pictures of the vehicle nor confirmed title before the trip. As Officer Struble explained, it "seemed suspicious" to him "to drive . . . approximately two hours . . . late at night to see a vehicle sight unseen to possibly buy it," *id.*, at 26, and to go from Norfolk to Omaha to look at it because "[u]sually people leave Omaha to go get vehicles, not the other way around" due to higher Omaha taxes, *id.*, at 65.

These facts, taken together, easily meet our standard for reasonable suspicion. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion," *Illinois* v. *Wardlow*, 528 U. S. 119, 124 (2000), and both vehicle occupants were engaged in such conduct. The

officer also recognized heavy use of air freshener, which, in his experience, indicated the presence of contraband in the vehicle. "[C]ommonsense judgments and inferences about human behavior" further support the officer's conclusion that Pollman's story about their trip was likely a cover story for illegal activity. *Id.,* at 125. Taking into account all the relevant facts, Officer Struble possessed reasonable suspicion of criminal activity to conduct the dog sniff.

Rodriguez contends that reasonable suspicion cannot exist because each of the actions giving rise to the officer's suspicions could be entirely innocent, but our cases easily dispose of that argument. Acts that, by themselves, might be innocent can, when taken together, give rise to reasonable suspicion. *United States* v. *Arvizu*, 534 U. S. 266, 274–275 (2002). *Terry* is a classic example, as it involved two individuals repeatedly walking back and forth, looking into a store window, and conferring with one another as well as with a third man. 392 U. S., at 6. The Court reasoned that this "series of acts, each of them perhaps innocent in itself, . . . together warranted further investigation," *id.,* at 22, and it has reiterated that analysis in a number of cases, see, *e.g., Arvizu, supra,* at 277; *United States* v. *Sokolow*, 490 U. S. 1, 9–10 (1989). This one is no different.

*        *        *

I would conclude that the police did not violate the Fourth Amendment here. Officer Struble possessed probable cause to stop Rodriguez for driving on the shoulder, and he executed the subsequent stop in a reasonable manner. Our decision in *Caballes* requires no more. The majority's holding to the contrary is irreconcilable with *Caballes* and a number of other routine police practices, distorts the distinction between traffic stops justified by probable cause and those justified by reasonable suspicion, and abandons reasonableness as the touchstone of the Fourth Amendment. I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

——————

No. 13–9972

——————

## DENNYS RODRIGUEZ, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[April 21, 2015]

JUSTICE ALITO, dissenting.

This is an unnecessary,[1] impractical, and arbitrary decision. It addresses a purely hypothetical question: whether the traffic stop in this case *would be* unreasonable if the police officer, prior to leading a drug-sniffing dog around the exterior of petitioner's car, did not already have reasonable suspicion that the car contained drugs. In fact, however, the police officer *did have* reasonable suspicion, and, as a result, the officer was justified in detaining the occupants for the short period of time (seven or eight minutes) that is at issue.

The relevant facts are not in dispute. Officer Struble, who made the stop, was the only witness at the suppression hearing, and his testimony about what happened was not challenged. Defense counsel argued that the facts recounted by Officer Struble were insufficient to establish reasonable suspicion, but defense counsel did not dispute those facts or attack the officer's credibility. Similarly, the Magistrate Judge who conducted the hearing did not question the officer's credibility. And as JUSTICE THOMAS's opinion shows, the facts recounted by Officer Struble "easily meet our standard for reasonable suspicion." *Ante,* at 11 (dissenting opinion); see also, *e.g., United*

—————————

[1] See Brief in Opposition 11–14.

*States* v. *Carpenter*, 462 F. 3d 981, 986–987 (CA8 2006) (finding reasonable suspicion for a dog sniff based on implausible travel plans and nervous conduct); *United States* v. *Ludwig*, 641 F. 3d 1243, 1248–1250 (CA10 2011) (finding reasonable suspicion for a dog sniff where, among other things, the officer smelled "strong masking odors," the defendant's "account of his travel was suspect," and the defendant "was exceptionally nervous throughout his encounter").

Not only does the Court reach out to decide a question not really presented by the facts in this case, but the Court's answer to that question is arbitrary. The Court refuses to address the real Fourth Amendment question: whether the stop was unreasonably prolonged. Instead, the Court latches onto the fact that Officer Struble delivered the warning prior to the dog sniff and proclaims that the authority to detain based on a traffic stop ends when a citation or warning is handed over to the driver. The Court thus holds that the Fourth Amendment was violated, not because of the length of the stop, but simply because of the sequence in which Officer Struble chose to perform his tasks.

This holding is not only arbitrary; it is perverse since Officer Struble chose that sequence for the purpose of protecting his own safety and possibly the safety of others. See App. 71–72. Without prolonging the stop, Officer Struble could have conducted the dog sniff while one of the tasks that the Court regards as properly part of the traffic stop was still in progress, but that sequence would have entailed unnecessary risk. At approximately 12:19 a.m., after collecting Pollman's driver's license, Officer Struble did two things. He called in the information needed to do a records check on Pollman (a step that the Court recognizes was properly part of the traffic stop), and he requested that another officer report to the scene. Officer Struble had decided to perform a dog sniff but did not

want to do that without another officer present. When
occupants of a vehicle who know that their vehicle con-
tains a large amount of illegal drugs see that a drug-
sniffing dog has alerted for the presence of drugs, they will
almost certainly realize that the police will then proceed to
search the vehicle, discover the drugs, and make arrests.
Thus, it is reasonable for an officer to believe that an alert
will increase the risk that the occupants of the vehicle will
attempt to flee or perhaps even attack the officer. See,
*e.g., United States* v. *Dawdy,* 46 F. 3d 1427, 1429 (CA8
1995) (recounting scuffle between officer and defendant
after drugs were discovered).

  In this case, Officer Struble was concerned that he was
outnumbered at the scene, and he therefore called for
backup and waited for the arrival of another officer before
conducting the sniff. As a result, the sniff was not com-
pleted until seven or eight minutes after he delivered the
warning. But Officer Struble could have proceeded with
the dog sniff while he was waiting for the results of the
records check on Pollman and before the arrival of the
second officer. The drug-sniffing dog was present in Of-
ficer Struble's car. If he had chosen that riskier sequence
of events, the dog sniff would have been completed before
the point in time when, according to the Court's analysis,
the authority to detain for the traffic stop ended. Thus, an
action that would have been lawful had the officer made
the *unreasonable* decision to risk his life became un-
lawful when the officer made the *reasonable* decision to wait
a few minutes for backup. Officer Struble's error—
apparently—was following prudent procedures motivated
by legitimate safety concerns. The Court's holding there-
fore makes no practical sense. And nothing in the Fourth
Amendment, which speaks of *reasonableness*, compels this
arbitrary line.

  The rule that the Court adopts will do little good going

forward.[2]  It is unlikely to have any appreciable effect on the length of future traffic stops.  Most officers will learn the prescribed sequence of events even if they cannot fathom the reason for that requirement.  (I would love to be the proverbial fly on the wall when police instructors teach this rule to officers who make traffic stops.)

For these reasons and those set out in JUSTICE THOMAS's opinion, I respectfully dissent.

---

[2]It is important to note that the Court's decision does not affect procedures routinely carried out during traffic stops, including "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Ante,* at 6.  And the Court reaffirms that police "may conduct certain unrelated checks during an otherwise lawful traffic stop." *Ibid.*  Thus, it remains true that police may ask questions aimed at uncovering other criminal conduct and may order occupants out of their car during a valid stop.  See *Arizona* v. *Johnson*, 555 U. S. 323, 333 (2009); *Maryland* v. *Wilson*, 519 U. S. 408, 414–415 (1997); *Pennsylvania* v. *Mimms*, 434 U. S. 106, 111 (1977) (*per curiam*).